**UNITED STATES BANKRUPTCY COURT
DISTRICT OF IDAHO**

| | |
|---|---|
| In Re:<br><br>**DIVINIA WATER, INC.,**<br><br>Debtor. | **Bankruptcy Case<br>No. 21-40059-JMM** |
| **DIVINIA WATER, INC.,**<br><br>Plaintiff/Counterdefendant,<br><br>v.<br><br>**CLEAR BLUE SPECIALTY<br>INSURANCE, CO.,**<br><br>Defendant/Counterplaintiff. | **Adv. Proceeding<br>No. 21-08012-JMM** |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Appearances:

      Robert Burns, Boise, Idaho, counsel for Plaintiff/Counterdefendant.

      Alyson Foster, Boise, Idaho, counsel for Defendant/Counterplaintiff.

**Introduction**

      Plaintiff/Counterdefendant, Divinia Water, Inc. ("Divinia"), commenced this

adversary proceeding against Defendant/Counterplaintiff, Clear Blue Specialty Insurance

Co. ("Clear Blue") seeking a determination that Clear Blue must provide it coverage under a directors and officers ("D&O") insurance policy for two state court lawsuits filed against Divinia and its directors and officers in 2020.[1]  Doc. No. 1.  Clear Blue filed an answer and counterclaim.  Doc. No. 18.[2]  Clear Blue seeks a declaration that the policy does not provide coverage for various reasons, including the claims were first made outside the policy period, the policy is void *ab initio* because Divinia made false representations on its application for coverage, and that other coverage exclusions apply, such as an insured versus insured exclusion and an exclusion for contractual liability. The trial was held from November 7 through November 10, 2022, and the parties submitted written closing arguments on November 30, 2022.[3]  Because the Court finds the D&O policy's insured versus insured exclusion dispositive of the question of Clear Blue's coverage obligations, the Court's decision focuses on the facts concerning this exclusion.

## Procedural History

Divinia filed for chapter 11 bankruptcy in January 2021.  BK Doc. No. 1.  On March 31, 2021, Divinia initiated this adversary proceeding against Clear Blue asserting

---

[1]  The Court will refer to the docket in this adversary proceeding as "Doc. No." and the docket in the main bankruptcy case as "BK Doc. No."

[2]  Divinia filed an answer, Doc. No. 13, to Clear Blue's counterclaim, Doc. No. 11, but not Clear Blue's first amended counterclaim, Doc. No. 18.  The changes between the counterclaim and the first amended counterclaim were *de minimis*.

[3]  Clear Blue filed its brief at 12:10 a.m. on December 1, 2022, after seeking an extension of time on November 29, 2022 to extend the deadline to December 2, 2022.  Doc. No. 73.  Divinia did not file a written objection to that extension.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–2

three claims for relief.  Doc. No. 1.  First, a declaratory judgment under 28 U.S.C.

§ 2201(a) that Clear Blue is obligated to reimburse Divinia for the attorneys' and experts'

fees it incurred in the investigation and defense of the state-court lawsuits (the

"Reimbursable Invoices"); second, damages for breaching the covenant of good faith and

fair dealing under the D&O policy by not timely and reasonably responding to Divinia

and not timely and reasonably processing and paying Divinia's Reimbursable Invoices;

and third, damages Divinia incurred as loss of access to funds necessary to defend against

the claims for Clear Blue's bad faith conduct in denying or withholding payment of the

Reimbursable Invoices.  *Id.*

In its three-count counterclaim, Clear Blue also sought a determination of its

coverage obligations.  Doc. No. 18.  At a pretrial conference held on June 28, 2021, Clear

Blue objected to the Court's authority to enter final orders in this proceeding.  Doc. No.

19 ¶ 3.  On July 14, 2021, the Court entered a pretrial order requiring the parties to brief

the jurisdiction and constitutional authority issue.  Doc. No. 19.  The parties subsequently

submitted briefs in support of their respective positions, Doc. Nos. 21–23, and the Court

held a hearing on the matter on September 20, 2021.  The parties agreed that there is

"related to" jurisdiction under 28 U.S.C. § 1334(b) and the Court has authority to propose

findings of fact and conclusions of law to the District Court under 28 U.S.C. § 157(c)(1).

Doc. No. 25.  On November 11, 2021, Divinia moved for summary judgment on Counts I

and II of its complaint, Doc. No. 26, which Clear Blue opposed.  Doc. No. 28.[4]  The

Court denied Divinia's motion by a decision and order issued on March 31, 2022.  Doc.

Nos. 41 & 42.  Thereafter, by stipulation of the parties, the Court bifurcated the trial on

liability and damages.  Doc. Nos. 47 & 48.  Phase I, which is the subject of this decision,

addresses whether Clear Blue has coverage obligations under Clear Blue Policy No.

AX010943-01 (12/11/2019-12/11/2020) for the underlying actions in *Breen v. Divinia*

*Water*, *Inc.*, No. CV10-20-3449 and *Breen v. Sedlmayr*, No. CV10-20-3463, both

pending in the District Court of the Seventh Judicial District of the State of Idaho, County

of Bonneville (collectively, the "Underlying Lawsuits").  Doc. No. 48.  If Phase I

concludes with a judgment issued by the District Court that Clear Blue has coverage

obligations for the Underlying Lawsuits, Phase II will commence.  *Id.*  Phase II is to

address the amount of Clear Blue's coverage obligations under the policy and Divinia's

claim for bad faith in Count III of its complaint.  *Id.*

Throughout the course of the four-day trial, the Court heard testimony and

numerous exhibits were admitted into the record, many by stipulation.[5]  The Court heard

live witness testimony from Steven Sedlmayr, Remy Sedlmayr, Kiersten Sedlmayr

Landers, Crosby Sedlmayr, Michael Breen, Eric Taylor, Matthew Price, and Jessica

---

[4]  Divinia filed a response to Clear Blue's objection at Doc. No. 35.

[5]  The parties' "master" exhibit list is at Doc. No. 62, which identifies the exhibits the parties stipulated to the admission of before trial.

Audet, and deposition testimony from Ronald Mezzetta.[6]  Based on the totality of the
evidence presented, and pursuant to 28 U.S.C. § 157(c)(1), this Court submits to the
District Court the following proposed findings of fact and conclusions of law to permit
the District Court to consider the entry of a final order with respect to Clear Blue's
coverage obligations.

### Proposed Findings of Fact

Divinia was an Idaho corporation located in Idaho Falls and the debtor in the
above-referenced chapter 11 bankruptcy case.  Divinia is no longer a going concern as its
operating assets were sold pursuant to its confirmed Subchapter V plan.  BK Doc. No.
108.  When it was operating, Divinia processed, bottled, and sold highly purified drinking
water using a proprietary purification technique developed by Steven Sedlmayr.  Divinia
was founded and operated by the Sedlmayr family:  Steven Sedlmayr, Remy Sedlmayr,
Kiersten Sedlmayr Landers, and Crosby Sedlmayr (collectively, the "Sedlmayrs").
Steven was a director and the president of Divinia since its incorporation.  Remy, who is
married to Steven, was a director and the corporate treasurer of Divinia since its
incorporation.  Their daughter, Kiersten, was director and the corporate secretary of
Divinia since its incorporation.  Their son, Crosby, was a director and the chief operating
officer of Divinia since its incorporation.  The Sedlmayrs owned a majority of Divinia's
stock at all relevant times.

---

[6]  Mezzetta's deposition transcript is at Exhibit 213.

Divinia incorporated in October 2015. At the time it was bottling its water in mason jars by hand and operating out of Steven and Remy's garage. Divinia relied on the services of LegalZoom for its organizational documents. One of its organizational documents, an "Action by Written Consent of the Sole Incorporator of Divinia," provided that Steven, Remy, Kiersten, Crosby, Sheldon Lu, and Michael Abdy were elected to serve as Divinia's initial directors. Ex. 211, p. 8. This was to be "until such time as his or her successor is duly elected and qualified[.]" *Id.* Sheldon Lu was an early investor of Divinia and a periodontist. Michael Abdy was an entrepreneur from Colorado who reached out about being on the board because his father apparently benefited from drinking the water. Abdy never participated as a board member notwithstanding his initial designation as a director.

Divinia adopted its bylaws ("Bylaws") and articles of incorporation through an "Action by Unanimous Written Consent in Lieu of First Meeting by the Board of Directors of Divinia." Ex. 211, p. 9. The written consent elected the Sedlmayrs to their respective positions as officers of Divinia "until their successors are duly elected and qualified, or their earlier death, resignation or removal[.]" *Id.* at 10. The written consent was signed by Steven, Remy, Kiersten, Crosby, and Sheldon Lu, "being all of the directors of" Divinia.[7] *Id.* at 15. While the signature page was dated November 9, 2015, Kiersten testified it was not signed by all the board members until sometime in November

---

[7] Abdy did not sign the consent, Ex. 211, p. 15, which is consistent with his lack of participation as a director throughout the relevant period.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–6

2017.  Ex. 103.  Similarly, the Bylaws were not executed until 2017.  What prompted Divinia to execute its Bylaws and the written consent was its onboarding of Ronald Mezzetta and Michael Breen and to open a company bank account.

Ronald Mezzetta and Michael Breen were early investors in, and later directors[8] of, Divinia.  Mezzetta formerly ran a canned and jarred foods company and was based out of Northern California.  Breen went to school with Mezzetta's children and was the CEO of a company, Convergent Mobile, in which Mezzetta invested.  At some point in 2016, Mezzetta heard about Divinia from an acquaintance and reached out to Steven to learn more about the water.  Mezzetta was interested in investing in Divinia and in October 2016, purchased a significant number of shares in the company.  Mezzetta advised Breen of the opportunity, and Breen purchased shares in the company in November 2016.  In 2017, Breen and Mezzetta purchased shares in a second round.[9]

On November 30, 2017, Divinia entered into a loan agreement ("Loan Agreement") with Breen and Mezzetta where Breen and Mezzetta agreed to loan money to Divinia to buy equipment for an automatic bottling line.  Ex. 6.  By this point, Divinia was operating out of leased warehouse space and focused on increasing production and

---

[8]  Divinia concedes Breen and Mezzetta were "acting" directors, but disputes that they were directors within the meaning of the insured versus insured exclusion in the D&O insurance policy.  Doc. No. 34, p. 14.

[9]  Divinia had 10 million shares authorized at the time.  Ex. 312.  Divinia's cap table reflects that Mezzetta purchased 470,000 shares at $0.40 per share and later 57,000 shares at $1.00 per share, for a total of 527,000 shares.  Ex. 104.  It reflects that Breen purchased 125,000 shares at $0.40 per share and later 70,000 shares at $1.00 per share, for a total of 195,000 shares.  *Id*.  Just before or contemporaneous with Divinia's addition of Breen and Mezzetta to the board, the Divinia increased its authorized shares to 20 million.  Ex. 325.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–7

attracting further investment. Under the Loan Agreement, Breen and Mezzetta agreed to loan up to $300,000 to Divinia to purchase specified equipment. *Id*. The loan matured on November 30, 2019, after which a 12% default interest rate would apply to any outstanding balance. *Id*. Some of the conditions of the Loan Agreement included Divinia securing D&O insurance in the minimum amount of $1,000,000 and electing Breen and Mezzetta to its board of directors until the loan was paid off.[10] Under the Loan Agreement, Divinia granted Breen and Mezzetta a security interest in the equipment and agreed not to encumber the equipment with any other liens. *Id*. Further, once the equipment was installed, Divinia was required to make monthly interest-only payments (at 5% per annum) until the maturity date. *Id*. The Loan Agreement provided that if Divinia borrowed money or issued equity, the proceeds would be used to pay down the loan. *Id*. This provision only took effect 24 months after the date of the first advance so long as Divinia complied with the terms of the Loan Agreement. *Id*. Divinia also represented it would provide Breen and Mezzetta monthly financial statements reflecting the financial status of Divinia. *Id*.

Breen testified they advanced funds under the Loan Agreement shortly after the agreement was executed and made disbursements over the course of the next 18 months.

---

[10]  Specifically, the Loan Agreement provided that "[Divinia] shall elect both [] Mezzetta and [] Breen to its Board of Directors." Ex. 6, p. 4. The Loan Agreement provided an event of default was if "at any time that any portion of the [loan] remains outstanding that either [] Mezzetta or [] Breen are no longer members of [Divinia's] board of directors[.]" *Id*. at p. 6.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–8

Ultimately, Breen and Mezzetta loaned not only the $300,000, but also an additional $50,000 in a series of disbursements.

Breen testified that he and Mezzetta insisted on D&O insurance as a term of the Loan Agreement because if something went wrong down the road, especially in view of Mezzetta's wealth, they needed the protection. Breen also said it was important for the Sedlmayrs to have D&O insurance because it is a basic thing a business needs when it starts taking money from outside investors to protect the directors in case investors object to the actions of the company.

On November 14, 2017, prior to the Loan Agreement's execution, Kiersten sent a pair of emails to Breen and Mezzetta. Ex. 103. The first message stated:

> I have attached documents amending the articles of incorporation. I am just waiting for Mr. Whyte to bring my book back with bylaws – he is also working on a document for a board invitation.
>
> The shareholder approval, recommendation, resolution and shareholder proxy form will be sent to our shareholders to sign before our meeting on Dec. 1[.]
>
> Standby for the rest.

*Id.* Later that afternoon, Kiersten emailed again, stating:

> -Attached is the amended articles of incorporation for a new board member for either one of you. I will have that field populated before I send it to all board members and bring it to a vote. I will also have it signed by board members before I mail it, same as amended articles of incorporation for stock issuance. I should have them all signed and mailed to all shareholders tomorrow.
>
> -Attached are our bylaws (attachment is too large for email, so click the link below)

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–9

-Attached are [sic] the Action by Unanimous Written Consent in Lieu of First Meeting by the Board of Directors.  Last page will be cleaned up and signed by all board members.

I will be writing a recommendation for an annual board meeting and resolution attached, with notice and approval.  We think December 1 will be the best date.

Thank you for your patience as I worked with our lawyer, Mike Whyte, in compiling these documents.

Ex. 103, p. 1.  Attached to these emails was a partially executed board resolution dated October 31, 2017 to recommend to the shareholders to add an additional director to Divinia's board of directors, a shareholder notice of a special meeting to approve the board's recommendation, a partially executed shareholder approval of the board recommendation (which was to be held December 1, 2017), and a shareholder proxy form to authorize Steven, in his capacity as chairman of the meeting, to vote to add Breen or Mezzetta to the board.  Ex. 103.  Kiersten, who served as Divinia's corporate secretary, testified the documents were prepared when either Breen or Mezzetta was going to be added to the board.

Later, Divinia,  Breen, and Mezzetta agreed that both Breen and Mezzetta would be added to the board, which is reflected in the Loan Agreement that was ultimately executed.  Divinia's corporate records adding Breen and Mezzetta as directors consisted of a resolution by Divinia's board of directors, a notice of special meeting of Divinia's shareholders, and a shareholder approval of the board recommendation. Ex. 4.  These

documents were the same as the ones Kiersten emailed to Breen and Mezzetta on

November 14, 2019, the only change being that Kiersten hand-wrote both of their names

onto the blank space of each of the documents.

The resolution stated:

RESOLUTION
ADDING ADDITIONAL DIRECTOR

A meeting of the Board of Directors was held on October 31, 2017
to discuss adding a Board of Director to replace the Board member that
recently resigned.
A discussion was had regarding whether or not to add another Board
member or to leave the Board at the current number.

Following the discussion, it was agreed by the Board of Directors
that an additional member should be added to the Board to replace the
recent opening.  It was further discussed and resolved to specifically
recommend to the Shareholders that [handwritten: Mickey Breen + Ronald
Mezzetta] be added as the additional Director.

RESOLVED:

It is resolved that the Board of Directors shall call a special meeting
of the Shareholders to seek approval of [handwritten: Mickey Breen +
Ronald Mezzetta] as an additional Director.

DATED this 31st day of October, 2017.

Ex. 4, p. 2.  The resolution was signed by Steven, Crosby, Remy, Kiersten and Sheldon

Lu as the board of directors.  *Id.*  Regarding the resolution's language about replacing a

board member who recently resigned, the evidence is unclear, although Steven suspected

that may have been Michael Abdy, but he also said Divinia never took any formal action

to remove Abdy nor did Abdy provide any kind of notice of resignation.  The notice of

special meeting to elect Breen and Mezzetta stated:

NOTICE OF SPECIAL MEETING
ELECTION OF ADDITIONAL BOARD MEMBER

> This is to advise the shareholders that a special meeting of the shareholders will be held on December 1, 2017, at the Company offices at 10:00 a.m. for the purpose of discussing and approving the Board of Directors' recommendation to add an additional member to the current Board of Directors.  It has been discussed and recommended that [handwritten: Mickey Breen + Ronald Mezzetta] be added to the Board of Directors to replace a Board member who resigned recently. A copy of the proposed resolution is attached to the Notice.

> DATED this 14th day of November, 2017.

Ex. 4, p. 1.  Kiersten testified at the time she sent the draft of this notice to Breen and

Mezzetta on November 14, 2017, the intent was to have a special meeting of

shareholders. The shareholder approval stated:

SHAREHOLDER APPROVAL OF BOARD RECOMMENDATION
ADDITIONAL BOARD MEMBER

> At a special meeting of the shareholders held on December 1, 2017, the shareholders discussed and approved the Board recommendation to add [handwritten: Mickey Breen + Ronald Mezzetta] as an additional Director of the Board.

> By signing this Approval, the undersigned Shareholders waive the hearing notice requirement outlined in the Bylaws, and consent to hold this special meeting.  The undersigned further approve of the Board recommendation to add [handwritten: Mickey Breen + Ronald Mezzetta] as an additional Director of the Board.  Undersigned Shareholders further approve the appointment of this board member.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–12

Those shareholders voting and approving the Board recommendation by proxy (if any) shall deliver their written proxy to the Secretary of the Corporation prior to, or at the beginning of the meeting.

DATED this 1st day of December, 2017.

Ex. 4, p. 6. The shareholder approval was executed by Divinia's directors: the Sedlmayrs and Sheldon Lu. None of Divinia's other shareholders signed the approval, including Breen and Mezzetta. Kiersten did not send out a notice of the special meeting or a shareholder proxy form to any of the other shareholders or ask any of the other shareholders to approve the addition of Breen and Mezzetta to the board because she thought the holders of the majority of the shares in the company could make the appointment. Kiersten testified that around this time Divinia handled corporate documentation by Kiersten trying her best to interpret the Bylaws. At the time of Breen and Mezzetta's appointment as directors, the following eleven individuals were also shareholders of Divinia: Mike Nash, Ralph and Jodi Stanton, Cam Fraser, Matthew Howarth, Thomas Skinner, Bart Kemp, Salvador Versaggi, Don Banducci, Ruth Mezzetta, and Giuseppe Mezzetta. Most of these shareholders were brought in by Breen and Mezzetta and they collectively held just under 12% of Divinia's shares at the time. Ex. 104.

Each of the Sedlmayrs testified they believed they correctly added Breen and Mezzetta to Divinia's board, and it was not until Divinia's counsel in the present matter (and their former counsel in the Underlying Lawsuits) informed them sometime between June and November of 2020 of an apparent defect in the shareholder election process

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–13

under Divinia's Bylaws that they thought otherwise. Divinia did not have any formal board meetings from the time period when Breen and Mezzetta were added to Divinia's board to when the loan went into default on December 1, 2019. Nor were there any annual shareholder meetings during this time.

At some point in 2018, Divinia determined to raise funds by selling its stock through an online public offering. This was done through Regulation Crowdfunding under the Securities Act. Pursuant to a "Unanimous Written Consent of the Board of Directors," Divinia resolved to sell and offer up to $1,070,000 in common stock at $1.50 per share. Ex. 110. Each of the Sedlmayrs signed the consent, along with Sheldon Lu and Breen and Mezzetta, which was effective as of July 26, 2018. *Id.* Divinia used StartEngine as its online portal and intermediary for the public offering. StartEngine was, in Steven's words, the middleman between Divinia and the SEC for the crowdfunding offering. In the lead up to executing the board approval document, Steven emailed Breen and Mezzetta on July 23, 2018, about the offering, saying that as part of SEC compliance Divinia, "must do a BAD ACTOR check on our Board of Directors." Ex. 329. Steven requested various information from Breen and Mezzetta for the bad actor check so the offering could proceed. *Id.*

On July 31, 2018, Divinia filed its Form C with the SEC to comply with Regulation Crowdfunding. Ex. 312. Attached to Form C was an offering memorandum explaining the offering in detail and disclosing information about the company, including its directors. *Id.* Breen and Mezzetta were listed as directors of Divinia. *Id.* Potential

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–14

investors could go to StartEngine's website and see Divinia's profile, which also identified Breen and Mezzetta as directors. Ex. 311.

In October 2019, Divinia participated in a pitch competition as part of Boise Entrepreneur Week, called the Trailmix competition. The event was for food and beverage startup companies and sponsored by Albertsons. Divinia was selected as a finalist and paired with an industry mentor/coach, Matthew Price, to prepare for a final pitch. Price lived in Boise and has worked in the startup and emerging business space for roughly 12 years. Divinia ultimately placed second at the Trailmix competition and then hired Price as a consultant in early November 2019. Price worked with the company for approximately two months until he resigned in mid-December. Price served as a consultant regarding marketing and strategy initially, but later he focused on investor relationships and raising capital.

On November 4, 2019, Mezzetta emailed Steven raising several concerns about Divinia's compliance with the terms of the Loan Agreement, including providing financial statements, obtaining D&O insurance, and the Sedlmayrs' level of communication with Breen and Mezzetta. Ex. 340. Mezzetta stated: "These issues must be addressed immediately and formally, or we will have no other choice than to spend money on legal help, the costs for which Divinia will be liable." *Id.* Steven responded via email on November 11, stating that Divinia was not in breach of some of the things Mezzetta alleged and would be working to resolve the other issues he brought up. *Id.*

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–15

In late November 2019, in light of the Loan Agreement's looming maturity date, Steven and/or Kiersten asked Price to speak with Breen and Mezzetta about the loan to see if they were willing to make terms on its repayment. Price reached out to Breen and Mezzetta on December 2, 2019, regarding the Loan Agreement and their "experience on the board and overall sense of the management team." Ex. 28.

Between December 3 and December 9, Breen and Mezzetta had telephone calls with Price where Breen and Mezzetta expressed concerns regarding Divinia's ability to pay off the funds loaned to it under the Loan Agreement, potential issues with Divinia's StartEngine raise campaign, lack of transparency, corporate governance, and failures to hold shareholder or board meetings.

On December 10, 2019 at 8:20 p.m., Breen emailed a demand for payment on the Loan Agreement to Steven in his capacity as president of Divinia and copied Kiersten, Mezzetta, and Stephen Perry.[11] Ex. 35.

> Hi Steven,
>
> Here is the demand for payment on our loan that we talked about on the phone last night. I will talk with you later on.
>
> Let me know if there are any questions.
>
> Thanks,

*Id*.

---

[11] Stephen Perry was the general counsel for Breen's company, Convergent Mobile, and the attorney who assisted Breen and Mezzetta with the Loan Agreement.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–16

The letter attached to email was dated December 11, 2019 and indicated pursuant to "Section 6(a)" of the Loan Agreement, Divinia "is in default of the Agreement. Demand is hereby made for immediate payment in full of the principal amount of the Advance plus accrued interest, fees, default interest, default fees and penalties." *Id*. Steven testified he talked to Breen the night before and Breen told him they had to send a demand letter for Divinia's default on repayment of the loan for formal reasons and that he knew Divinia was working to get the loan paid off and he would not sue them. Breen could not remember anything specific from his phone call with Steven on December 9, but Breen acknowledged the demand letter just concerned repayment of the loan.

Also on December 10, 2019, Breen emailed Remy asking for a copy of Divinia's current D&O insurance policy and the insurance policy on the equipment. Ex. 300. On Wednesday, December 11, 2019 at 2:22 p.m., Breen texted Kiersten about the documents he requested from Remy the previous day. Ex. 120. Kiersten said Remy would be emailing them shortly. *Id.*

At 2:51 p.m. Breen texted Kiersten, "One is for property, but it doesn't look like the D&O insurance was ever put in place. She sent me a quote from 12/17[.]" *Id.* Kiersten responded a few minutes later, "Yes, we don't have D&O because we have been getting some high quotes. She was hoping you could help her figure out the best one." *Id*. Breen replied, "That doesn't matter how much it cost. It puts [Mezzetta], Sheldon [Lu], your whole family and my self [sic] at risk. This is a default that cannot be

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–17

overlooked.  This is the most important insurance to have.  It doesn't look like DIVINIA

ever secured a policy." *Id*.  Kiersten replied at 2:59 p.m.:

> I'm happy to help you and I am getting it taken care of.  They needed
> reliable financial information and our Quickbooks and accounting had
> to be adjusted, which just got done late last week.  You can even ask our
> accountant and lawyer about how problematic it has been.
>
> At any rate, we were shopping the quotes while we were fixing the
> accounting issues.
>
> I told Remy to get the policy done today.
> …

Ex. 120.  Breen stated: "Ok. This policy was supposed to be in place 2 years ago and

when I relay this to [Mezzetta], all hell is going to break loose." *Id*.  At 3:08 p.m.,

Kiersten said "We told [Mezzetta] before[.]" *Id*.  Breen said "And I can see that you are

still taking in money from crowd funding.  There is no way that you told [Mezzetta] there

was no D&ain't [sic] insurance in place." *Id*.  Kiersten responded, "Yes we have." *Id*.

Breen asked her to show him proof because he was meeting Mezzetta shortly.  *Id*.

Kiersten texted an excerpt from the November 4, 2019 email Mezzetta sent Steven where

Mezzetta said, "Another major concern we have is that according to the contract we are

supposed to have insurance as directors.  We have not been provided any proof by you

that this insurance has been procured by Divinia.  Another breach." Ex. 120.  Breen

responded:

> That doesn't mean you didn't have it.  That means you didn't share the
> proof it was in place.  [Mezzetta] would never go along with not having
> insurance.  I'm sitting with him right now.  He would never agree to expose
> himself with the assets he has.  Remember this … you said you and your

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–18

dad will be in the Bay Area to meet us in a weeks [sic] time.  The clock
starting [sic] ticking on Monday when we talked.

*Id.*  On December 11, 2019 from about 4:00 to 5:10 p.m., Breen and Crosby exchanged

text messages:

> Breen: Do you know all the stuff that is going on?
>
> Crosby: What do you mean [Breen]?
>
> Breen: I mean all the talk that is not true.  No D&O insurances in place, no
> financials, default on the loan, multiple loans on the equipment… what else
> is there?
>
> Crosby: Let's not try to stir the pot [Breen], there is nothing else.  We're
> trying to come to a resolution with you guys.  We've finally been able to
> get a CPA that can do the financials, otherwise we've been having to try to
> do them ourselves on top of running the day to day and raise funds.  We've
> been trying to get the insurance;  If you know of an insurance company that
> will sell us d&o, please let us know, otherwise we've been getting
> stonewalled by the insurance companies on that front.  I understand you're
> frustrated right now; we're in same boat together.  Let's work together so
> we can get the stuff you need in place and resolve this.  I know you and
> [Mezzetta] wanted to meet in person, and Steven is working on getting out
> to you guys so we can get this resolved in a way that makes sense for both
> of us.

Ex. 100.  Breen replied, "2 years to get insurance? Not acceptable…" and "This is

fraud… no board meetings, no shareholder meetings, no financials, no insurance and no

shareholder notification."  *Id.*  Crosby did not reply to the message.  Breen testified what

he meant by "fraud" in this text message is someone saying they are going to do

something and then not doing it.

On December 11, 2019 at around 6:30 p.m., Remy submitted an application to

obtain D&O insurance on behalf of Divinia (the "Application").  Ex. 3.  The stated

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–19

purpose of the Application was for "For directors [sic] protection." *Id*. at p. 1.  Remy

testified Divinia applied for D&O insurance at this time because Kiersten told her that

Breen was "mad as hell" that Divinia did not have D&O insurance in place and that they

needed to find it as soon as possible.  The Sedlmayrs testified they did not have D&O

insurance up until then because it was cost prohibitive.  Per Crosby, previously they were

getting quotes between $10,000 to $20,000 per year.  The premium of the policy they

purchased was just under $4,000.  Ex. 209 at p. 6.

The Application included the following question:

**Past claims**

To your knowledge, are any of the following true:
- Over the past three years, the company has been the subject of a lawsuit
  alleging a violation of any state, federal, or securities laws.
- Over the past three years, the company has filed a claim for the coverage I
  am applying for.
- *I am already aware of a specific circumstance that is likely to result in a
  claim under the coverage I am applying for.*
- The company has previously initiated a bankruptcy or anticipates going
  bankrupt in the next year.

Ex. 3, p. 3 (emphasis added).  Divinia, vis a vis Remy who filled out the Application,

answered "No[.]"  *Id.*  Based on the Application, Clear Blue issued Policy Number

AX01-0943-01, for the policy period of 12:01 a.m. 12/11/2019 to 12:01 a.m. 12/11/2020,

to Divinia (the "Policy").  Ex. 209.

On December 13, 2019, Kiersten emailed Breen with Steven and Mezzetta

included with the subject line, "Next Steps[.]"  Ex. 10.  She said:

Thank you for your time today.  Per our conversation:

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–20

1. I Just sent an email to you with Mike Whyte's contact. He is happy to hop on a call with your ID [Idaho] lawyer.

2. I will send the most recent cap table for your review on Monday. We can go over what needs to get added/changed so that it is cleaned up.

3. I emailed Mike Whyte asking him to come by next week to go over points of compliance you listed – I will work on scheduling a shareholders meeting.

*Id.* Kiersten's written notes from the December 13 call included the following:

> Bigger issues
> -disclosures
>      -current investors
>      -crowd funders
> -board meetings
> -being protected

Ex. 11. On December 17, 2019, Breen emailed Steven asking for the StartEngine raise to be shut down. Ex. 121. Breen said:

> [Mezzetta] and I met today and we want the Start Engine funding to be **shut down**. This is becoming too risky for all of the Directors. There are a lot of items that are not being reported to these new investors. If for some reason one of these investors starts asking for info, Divinia is going to be in trouble.
>
> We saw that there was a comment on Start Engine made by someone today about how much more funding is the company going to do. Your response was that we are going to take this up to 1 million dollars and that you are working with the board to resolve this. [Mezzetta] and I haven't heard anything about going to 1 million dollars. We don't have any idea where the monies that are being raised are going. All of the board members are liable for what goes on at Divinia. Originally when you all started this raise with Start Engine, [Mezzetta] and I were supposed to be paid back first. That was part of our loan agreement.
>
> Please let us know when the crowdfunding is shut down. We are not in favor of this as board members. Remember, this was never voted on in a board meeting, and I don't think your quorum is going to hold up. Kiersten

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–21

stated in our last call that there are no written minutes for the board
meetings.

*Id.*

Later that day, Kiersten replied to Breen.  Each of Divinia's board members were
copied with her reply as well as Breen and Mezzetta's Idaho counsel.  *Id.*  Kiersten
attached a document called "Unanimous Written Consent of the Board," which was sent
via email to all board members.  *Id.*  Each board member replied via email with their
signed consent.  *Id.*  She explained the consent was sent to StartEngine who would not let
them proceed without the signatures.  *Id.*  She also attached correspondence from Steven
to Breen and Mezzetta which included Divinia's goal to raise $1 million.  *Id.*  Last, she
said she was sorry if she misspoke or misunderstood but that she did have past meeting
minutes from 2017 and 2018, which have been reviewed, copied and held at the offices
of their lawyer Mike Whyte.  *Id.*  She said she did not have meeting minutes from 2019
because they have not had the board meeting or shareholder meetings, which she said she
was working on scheduling.  *Id.*  In reply, Breen asked Kiersten, for among other things,
a:

> 1. Copy of all the signed resolutions by all board members[,]
> …
> 3. Copy of all board meeting minutes and resolutions from 11/17 to
> present?
> …

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–22

Ex. 121.  Kiersten responded that day indicating they would compile all of these

documents and get them to Breen and the board as soon as possible.[12]  Ex. 306.

She also notified him and the board that she had been working with StartEngine to

file a notice of the default of repayment of the loan under the Loan Agreement

with the SEC.  *Id.*

     After Divinia defaulted on the Loan Agreement, Breen and Mezzetta

requested an accounting from Divinia to review the corporation's financial

information to understand why it was unable to repay the loan.  Through Breen

and Mezzetta's scrutiny of Divinia following the default of the Loan Agreement,

Breen and Mezzetta came to believe that Divinia was using corporate assets for

the personal expenses of the Sedlmayrs, subjected the equipment financed under

the Loan Agreement to other liens, and made various misrepresentations.

     On January 3, 2020, Kiersten coordinated a telephonic board meeting for Divinia.

Ex. 107.  On January 8, 2020, Divinia held the board meeting where the board discussed,

among other things, Divinia's 2019 sales and where and how sales were generated.  *Id.*

Per Kiersten's meeting minutes, each member of Divinia's board was present and among

the topics discussed were:

---

[12]  With respect to Breen's request for copies of all board meetings and resolutions from November 2017 to the present, in a draft email Divinia's counsel, Whyte, proposed to send to Breen and Mezzetta's attorney, Whyte stated "The board did not have any official meetings during that period of time. However, the company had ongoing conversations with the board members with respect to its actions.  I have discussed with Divinia the need for regular, more than annual board meetings.  These regular board meetings will start in early 2020."  Ex. 12.  There is no indication in the record that this email was ever sent.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–23

-Discussion over the note
    -[Mezzetta] suggests that he [sic] seeking full information in regards to the
    patents
    …
    -Steven suggested that concerns of the note must be addressed between
     Counsel[.]

*Id.*

Between March and May 2020, Divinia, via the Sedlmayrs, and Breen and

Mezzetta engaged in negotiations for repayment of the loan under the Loan Agreement

and to restructure Divinia's board of directors and to replace some of its officers, but they

were unsuccessful.

On May 8, 2020, Divinia called a special meeting of its board of directors for

Steven to step down as CEO of Divinia and to appoint James Ishii, an acquaintance of

Steven, as interim CEO.  Ex. 203 ¶ 33.  Breen and Mezzetta's counsel emailed Divinia's

counsel objecting to the meeting and the action taken on grounds of improper notice and

advised Breen and Mezzetta would be willing to "ratify the meeting and vote" if all

outstanding issues were resolved.  *Id.* ¶ 34.  On May 12, 2020, Divinia called an

"emergency meeting," where it acted to formally remove Breen and Mezzetta as directors

for cause under its Bylaws and the Idaho Business Corporation Act pursuant to a

recommendation by Ishii.[13]  Ex. 318.  In Ishii's memorandum supporting his

recommendation, he alleged that Breen and Mezzetta engaged in conduct detrimental to

the company, such as conspiring to take it over and threatening other directors.  *Id*.

---

[13]  The "Notice of Emergency Meeting" stated it was being held "for the purpose of removing directors, []
Breen and [] Mezzetta from the Board with cause."  Ex. 337.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–24

Breen and Mezzetta did not receive notice of the meeting at least 48 hours prior to the meeting[14] or provide their consent to the action taken at the meeting.  Ex. 203 ¶ 35. Breen and Mezzetta objected to the meeting and their removal from the board, asserting they were guaranteed board seats until the amounts owed under the Loan Agreement were paid.  *Id.*

On June 10, 2020, Eric Taylor, counsel for Breen and Mezzetta in the Underlying Lawsuits, sent a shareholder demand to Divinia to investigate their allegations concerning potential derivative claims and to take appropriate action in accordance with Idaho's statutory demand requirement for shareholder derivative actions.  Ex. 201.  On June 12, 2020, Breen and Mezzetta filed the Underlying Lawsuits: Case No. CV10-20-3449 (the "Loan Lawsuit")[15] and Case No. CV10-20-3463 (the "Shareholder Lawsuit") against Divinia and the Sedlmayrs.  Exs. 1 & 2.[16]

The Loan Lawsuit was filed by Breen and Mezzetta in their individual capacity against Divinia and the Sedlmayrs in their individual capacities.  Ex. 2.  Its five counts were:

> Count I, breach of contract against Divinia;
> Count II, breach of covenant of good faith and fair dealing against Divinia;
> Count III, fraudulent misrepresentation/concealment against Divinia and the Sedlmayrs;

---

[14]  This was a requirement for special board meetings under Section 2.4 of Divinia's Bylaws.  Ex. 211.

[15]  Breen and Mezzetta filed an amended complaint in the Loan Lawsuit on September 28, 2020.

[16]  Exhibit 1 is mislabeled on the parties' exhibit list, Doc. No. 62, as being the complaint in the Loan Lawsuit, but it is the complaint filed in the Shareholder Lawsuit.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–25

Count IV, unjust enrichment against Divinia (as an alternative theory to
breach of contract);
Count V, alter ego count against the Sedlmayrs to hold them personally
liable for any of the damages in the foregoing counts.

Ex. 2. To summarize, counts I, II, and IV alleged Divinia is liable for damages under the

Loan Agreement; count III alleges that Divinia and the Sedlmayrs are liable for

fraudulent misrepresentation in the Loan Agreement and in inducing Breen and Mezzetta

to enter it; and count V alleges that the Sedlmayrs are liable for damages under an alter

ego theory for the preceding counts asserted against Divinia. *Id.*

The Shareholder Lawsuit was filed by Breen and Mezzetta, individually and in

their capacity as shareholders/directors, and by Divinia, through Breen and Mezzetta as

shareholders. Ex. 1. The lawsuit was filed against the Sedlmayrs in their individual

capacity and as officers/directors of Divinia, James Ishii in his individual capacity and as

an officer of Divinia, and nominally Divinia. *Id.* The claims in this lawsuit allege that

Divinia, Ishii, and the Sedlmayrs committed a variety of statutory and common law

violations based on fraud, self-dealing, misappropriation of corporate assets, and

breaches of fiduciary duties. *Id.* The allegations underlying the claims included that the

Sedlmayrs: used corporate assets for personal expenses without board approval, used the

StartEngine crowdfunding raise to cover corporate losses, fraudulently misrepresented

share prices to Breen and Mezzetta, wrongfully removed Breen and Mezzetta from the

board, and breached Divinia's Bylaws by not holding annual shareholder meetings or

maintaining appropriate books and financial records.  *Id.*  The counts alleged in the

Shareholder Lawsuit were:

- Count I, for a preliminary injunction and application for receiver against all defendants (direct and derivative action);
- Count II, breach of contract (Divinia's Bylaws) against all defendants (direct and derivative action);
- Count III, breach of the implied covenant of good faith and fair dealing against all defendants (direct and derivative action);
- Count IV, fraud against Steven (direct action);
- Count V, breach of fiduciary duty against all defendants (direct and derivative action);
- Count VI, misappropriation of corporate assets against the Sedlmayrs (derivative action);
- Count VII, unjust enrichment against all defendants (derivative action);
- Count VIII, improper distributions under Idaho Code § 30-29-640 against the Sedlmayrs (direct and derivative action);
- Count IX[17], fraudulent transfer under Idaho Code § 55-901 et seq. against the Sedlmayrs (direct action);
- Count X, defamation against Ishii (direct action);
- Count XI, declaratory judgment under Idaho Code § 10-1201 against all defendants (direct and derivative action);
- Count XII, minority shareholder oppression against all defendants (direct and derivative action); and
- Count XIII, violation of Idaho's racketeering act under Idaho Code § 18-7801 *et seq*. against all defendants (direct and derivative action)

Ex. 1.

Divinia and the Sedlmayrs filed answers and counterclaims to the Underlying

Lawsuits on November 2 and 4, 2020, respectively, denying the material adverse

allegations.  Exs. 202 and 203.

---

[17]  Counts IX through XIII were mislabeled in the Shareholder Lawsuit complaint as counts IV through VIII.  Ex. 1, p. 23–29.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–27

On November 4, 2020, Divinia's counsel in this proceeding submitted a "Notice of Claim for Directors & Officers Coverage" under the Policy for the Underlying Lawsuits (the "Notice of Claim"). Ex. 208. The Notice of Claim stated that "Divinia first became aware of the circumstances alleged against its directors and officers in the two referenced complaints by the plaintiffs' demand letter dated June 10, 2020, with both cases being filed two days later on June 12, 2020." *Id*. Divinia attached the complaints in the Underlying Lawsuits and its answers and counterclaims. *Id.* Divinia did not tender the defense of the Underlying Lawsuits to Clear Blue, but instead requested coverage for defense costs and liability for the Underlying Lawsuits.[18]

On November 24, 2020, in response to a request for additional information, Divinia's attorney provided Sedgwick, the third-party claim administrator for Clear Blue, supplemental information. On January 26, 2021, Sedgwick provided Divinia's attorney a letter which identified provisions of the Policy that do or may preclude coverage and reserved its rights as to coverage or liability of Clear Blue. On January 27, 2021, Divinia filed for chapter 11 bankruptcy. BK Doc. No. 1.

On March 5, 2021, Sean Coletti, counsel for the Sedlmayrs and Ishii in the Underlying Lawsuits, submitted invoices for attorneys and experts' fees to Clear Blue totaling $237,208.91 that were purportedly incurred to investigate and defend against the

---

[18] While it is not abundantly clear, Divinia apparently is not seeking coverage for James Ishii under the Policy. Neither party addressed coverage for Ishii at the trial, nor did Divinia reference him by name in its complaint. In Divinia's Notice of Claim, Ishii is referenced as one of Divinia's officers, but in a later communication between Divinia and Clear Blue, Divinia identified that Ishii's representation (but no other Team Members' or Divinia's) is covered under Divinia's liability insurance policy with Acuity Insurance. Doc. No. 1, Ex. 2.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–28

Underlying Lawsuits. Divinia incurred this amount prior to seeking and obtaining Clear

Blue's consent. Clear Blue did not provide coverage, a defense, or reimbursement for

Divinia or Steven, Remy, Kiersten, or Crosby's expenses incurred in connection with the

Underlying Lawsuits. Clear Blue never formally disclaimed coverage until it denied

coverage via its answer and counterclaim in this proceeding.

### Proposed Conclusions of Law

**1. Legal standard**

The Policy has a choice of law provision providing that Idaho law governs the

resolution of any disputes involving the Policy. Ex. 209, p. 24. Under Idaho law "the

party seeking recovery" must "first show that the claim is apparently within policy

coverage." *Buckley v. Orem*, 112 Idaho 117, 122, 730 P.2d 1037, 1042 (Ct. App. 1986).

The general rules of contract law apply when interpreting insurance policies, subject to

certain special canons of construction. *Clark v. Prudential Prop. & Cas. Ins. Co*., 138

Idaho 538, 540, 66 P.3d 242, 244 (2003). Idaho courts have long recognized, "[i]t is the

function of the Court to construe a contract of insurance as it is written, and the Court by

construction cannot create a liability not assumed by the insurer, nor make a new contract

for the parties, or one different from that plainly intended, nor add words to the contract

of insurance to either create or avoid liability." *Pena v. Viking Ins. Co*., 169 Idaho 730,

736, 503 P.3d 201, 207 (2022) (internal citations omitted). The first step in interpreting

an insurance policy, as with any contract, is to determine if any ambiguity exists in the

plain language of the policy. *Martinez v. Idaho Counties Reciprocal Mgmt. Program*,

134 Idaho 247, 250, 999 P.2d 902, 905 (2000). If the policy language is clear and

unambiguous, coverage must be determined according to the plain meaning of the words

used as a matter of law. *Mut. of Enumclaw Ins. Co. v. Roberts*, 128 Idaho 232, 235, 912

P.2d 119, 122 (1996). If the policy is reasonably subject to differing interpretations,

however, the language is ambiguous and its meaning is a question of fact. *Moss v.*

*MidAmerica Fire and Marine Ins. Co*., 103 Idaho 298, 300, 647 P.2d 754, 756 (1982).

        Because insurance contracts are adhesion contracts typically not subject to

negotiation between the parties, the general rule is that any ambiguity in the contract is

construed most strongly against the insurer. *Farmers Ins. Co. of Idaho v. Talbot*, 133

Idaho 428, 432, 987 P.2d 1043, 1047 (1999) (citing *Mut. of Enumclaw Ins. Co. v.*

*Roberts*, 128 Idaho at 235, 912 P.2d at 122). "The burden is on the insurer to use clear

and precise language if it wishes to restrict the scope of coverage and exclusions not

stated with specificity will not be presumed or inferred." *Clark v. Prudential Prop. &*

*Cas. Ins. Co*., 138 Idaho at 540–41, 66 P.3d at 244–45 (citing *Moss v. Mid–America Fire*

*and Marine Ins. Co*., 103 Idaho at 300, 647 P.2d at 756). Stated differently, "a provision

excluding coverage is strictly construed in favor of the insured[.]" *Arreguin v. Farmers*

*Ins. Co*., 145 Idaho 459, 462, 180 P.3d 498, 501 (2008).

## 2. The Policy

        The Policy is a "claims-made" policy, meaning it limits coverage to defined

claims made against the insured during the policy period. The Policy has three main

parts: Declarations, Policy General Terms and Conditions ("General Terms and

Conditions"), and the Directors, Officers & Organization Liability Policy ("Coverage

Part"). Ex. 209. The Declarations list the coverage, policy number, policy period, limits,

premiums, and retentions (which are akin to deductibles in a health insurance policy).

*Id.* at p. 5–9. The General Terms and Conditions contain definitions and terms and

conditions that apply to the Policy. Other terms are defined in the Coverage Part and

have specific meanings depending on the coverage purchased. The Coverage Part

features the policy provisions for the coverage purchased, which in this case is directors,

officers, and organization coverage ("D&O coverage"). *Id.* at p. 25–37. The Coverage

Part describes the types of loss covered and includes definitions of terms used in the

Coverage Part and exclusions to coverage. The types of loss covered by the Policy

include "Non-Indemnifiable Directors & Officers Liability" (Insuring Agreement A),

"Indemnifiable Directors & Officers" (Insuring Agreement B), "Entity Liability"

(Insuring Agreement C), "Derivative Costs" (Insuring Agreement D), "Employed

Lawyers" (Insuring Agreement E), and "Crisis Costs" (Insuring Agreement F). *Id.* at p.

26. Collectively, Divinia and Clear Blue identified the first four of these agreements as

being potentially implicated by Divinia's claims.

       Insuring Agreement A, "Non-Indemnifiable Directors & Officers Liability,"

states:

> We will pay **Non-Indemnifiable Loss**[19] on behalf of the **Insured** resulting
> from a **Claim** first made against the **Insured** during the **Policy Period** or

---

[19] "**Non-Indemnifiable Loss**" is defined as "**Loss** incurred by **Team Members** that the **Tech Startup** has not indemnified." Ex. 209, p. 30.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–31

any applicable Extended Reporting Period and reported to Us pursuant to the terms of the Policy, for a **Wrongful Act** by the **Insured**.

Insuring Agreement B, "Indemnifiable Directors & Officers," states:

We will pay **Loss** on behalf of the **Insured** that such **Insured** has indemnified the **Team Members** resulting from a **Claim** first made against the **Team Members** during the **Policy Period** or any applicable Extended Reporting Period and reported to Us pursuant to the terms of this Policy, for a **Wrongful Act** by the **Team Members**.

Insuring Agreement C, "Entity Liability," states:

We will pay **Loss** on behalf of the **Insured** resulting from a **Claim** first made against such **Insured** during the **Policy Period** or any applicable Extended Reporting Period and reported to Us pursuant to the terms of this Policy, for a **Wrongful Act**.

Insuring Agreement D, "Derivative Costs," states:

We will pay on behalf of the **Insured** any **Derivative Costs**[20] the **Insured** becomes legally obligated to pay as a result of a **Derivative Demand**[21] first received by the **Insured** during the **Policy Period** or any applicable Extended Reporting Period and reported to Us pursuant to the terms of this Policy, for a **Wrongful Act**. …

Ex. 209, p. 26.

An Insured under the Policy means Team Members with respect to Insuring Agreement A and the Tech Startup with respect to Insuring Agreements B, C, D, E, and

---

[20] "**Derivative Costs**" are defined as "reasonably and necessary expenses incurred in the investigation and evaluation of a **Derivative Demand**, provided that **Derivative Costs** shall not include compensation, benefit expenses, or any of the **Insured's** overhead." Ex. 209, p. 28.

[21] "**Derivative Demand**" is defined as "a written demand by any security holder of the **Tech Startup**, in their capacity as such, upon the board of directors or managers of such **Tech Startup** to bring a civil proceeding on behalf of the **Tech Startup** against a **Team Member** for a **Wrongful Act** of such **Team Member** if such demand is made without the assistance, participation or solicitation of any **Executive**. A **Derivative Demand** shall be deemed commenced by the receipt by the board of directors or managers of such demand." Ex. 209, p. 28.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–32

F. Ex. 209, p. 29. Divinia is defined under the Policy as the Tech Startup.[22]  Relevant

bolded terms are defined within the Policy as follows:

- "**Loss**" is defined to include "the amount the **Insured** is legally obligated to pay resulting from a **Claim**, including damages, settlements, judgments, pre- and post-judgment interest, **Defense Costs**, and Investigation Costs."  *Id.*

- "**Defense Costs**" means "that part of **Loss** consisting of expenses, including attorneys' fees and experts' fees, incurred in the investigation, defense or appeal of a **Claim**."

- "**Team Member**" is defined as an "1. **Executive**; or 2. **Employee**." An "**Executive**" is defined as "any natural person who was, is or shall be a duly elected or appointed … director, officer, or member of the board[.]"

- A "**Claim**" is defined to mean "any:

  1. Written demand against the **Insured** for monetary damages or non-monetary or injunctive relief…[;]
  2. … civil or criminal complaint,
  …
  6. Solely for the purpose of Insuring Agreement D, any Derivative Demand.

- A "**Wrongful Act**" is, as relevant to this proceeding, "any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by: … [a] Team Member in their capacity as such" or Divinia for Insuring Agreement C.

- "**Policy Period**" is defined as 12:01 a.m. 12/11/2019 to 12:01 a.m. 12/11/2020.

---

[22]  The use of the phrase "Tech Startup" is not entirely accurate since Divinia is not a tech startup; but per Clear Blue the Policy was designed for tech startups and Divinia purchased this particular plan, which is why it uses that phrase.  Clear Blue asserts the phrasing has no bearing on coverage for Divinia.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–33

The Policy also has several exclusions, one of which is for lawsuits brought by Insureds.  Under this exclusion, the Policy does not provide coverage for actions brought by Divinia or Team Members subject to certain exceptions.

## 3. Analysis

Clear Blue argues that it has no coverage obligations for the Underlying Lawsuits for various reasons.  First, it argues the Policy does not provide coverage for the Underlying Lawsuits because they are not Claims first made during the Policy Period.  In making this argument, Clear Blue relies on the definition of Claim, Single Claims, and Related Claims under the Policy.  Clear Blue asserts a Claim was first made against Divinia via the demand for payment under the Loan Agreement that Breen emailed to Steven on December 10, 2019—the day before the Policy took effect—and that the Loan Lawsuit and Shareholder Lawsuit are deemed to have been made prior to the Policy Period because these claims arise out of the same Wrongful Acts or Interrelated Wrongful Acts.  Second, Clear Blue argues Divinia failed "to disclose specific circumstances at the time of its Application" such that Divinia's claims for coverage are excluded and the Policy is void *ab initio*.[23]  In particular, Clear Blue argues Divinia should have disclosed on its Application its default under the Loan Agreement, the discord among its board members (the Sedlmayrs and Breen and Mezzetta), and Breen

---

[23] Based on the evidence presented at trial, the Court is skeptical that either of these two theories would preclude Clear Blue from providing coverage under the Policy, but the Court need not decide that at this time for the reasons described starting on page 35.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–34

and Mezzetta's SEC fraud allegations concerning the StartEngine raise.  Third, Clear

Blue argues the Policy's insured versus insured exclusion applies since Breen and

Mezzetta were directors of Divinia; and and fourth and finally, Clear Blue argues the

Policy's exclusion for contractual liability applies to the Loan Lawsuit against Divinia.[24]

In retort, Divinia asserts none of these arguments have merit.

### A.  Does the Policy's insured versus insured exclusion apply?

The Court finds the dispositive issue in this case is the insured versus insured

exclusion and accordingly focuses its decision there.  This provision, which is found

under the Coverage Part of the Policy, provides:

> **IV.  Exclusions**
> …
> [Clear Blue] shall not be liable … to pay any **Loss** on account of that
> portion of any **Claim** made against You:[25]
> …
> F.        **Insured** versus **Insured**
>
> For any **Claim** brought or maintained by or on behalf of:
>
>> 1. a **Tech Startup**; [defined as Divinia]
>> 2. a **Team Member** in any capacity;
>
> …
>
> Provided this exclusion does not apply to: [various exceptions footnoted
> below.][26]

---

[24] Clear Blue also asserts a Policy exclusion for personal profit and illegal conduct could preclude coverage.  However, such conduct must first be evidenced by a final adjudication adverse to Divinia in one of the Underlying Lawsuits.  Ex. 209, p. 34–35.  Clear Blue argues, and the Court agrees, that this exclusion is not ripe since no determination of the merits has been made in the Underlying Lawsuits.

[25] "You" is defined as the named insured in the Declaration part of the Policy, which is Divinia.  Ex. 209, p. 6 & 11.

Ex. 209, p. 33–34.  A Team Member is defined as any "**Executive**" or "**Employee**."  An "**Executive**" is defined as "any natural person who was, is or shall be a *duly elected or appointed*: 1.  Director, officer, or member of the board…."  *Id.* at 12 (emphasis added).

If applicable, this exclusion would exclude from coverage Breen and Mezzetta's derivative claims brought on behalf of Divinia and any claims Breen and Mezzetta brought directly against Divinia or any of its Team Members if Breen and Mezzetta were or are "duly elected or appointed" directors of Divinia.  If none of the exceptions to the

---

[26]  The exceptions in the Policy are:

1. **Defense Costs** covered under Insuring Agreement A;
2. Any **Claim** for a **Wrongful Act** involving the employment of a **Team Member**;
3. Any **Claim** by a **Team Member** for contribution or indemnity; if the **Claim** directly results from another **Claim** covered under this **Coverage Part**;
4. Any **Claim** brought by a whistleblower pursuant to any federal, state, foreign or local whistleblower law;
5. Any **Claim** brought as a derivative action on behalf of the **Tech Startup**, by one or more persons who are not directors, officers, trustees, managers, or equivalent executives of the **Tech Startup**s [sic], and without the solicitation, assistance, active participation, or intervention of any **Insured** unless such solicitation, participation or intervention by the **Insured** is solely pursuant to or in compliance with a subpoena or similar legal process or is protected pursuant to any whistleblower statute, rule, or regulation;
6. Any **Claim** by or on behalf of a bankruptcy or insolvency receiver, trustee, examiner, conservator, liquidator, creditor's committee or rehabilitator or an [sic] **Tech Startup** or **Outside Entity** or any assignee of any of the foregoing;
7. Any **Claim** maintained in any non-common law jurisdiction outside of the United States of America;
8. Any **Claim** by a **Team Member** who has not served as a **Team Member** within one (1) year prior to the date on which the **Claim** is first made and who maintains such **Claim** without the active assistance or active participation of the **Tech Startup** or **Outside Entity**, or any other **Team Member** who is serving or has served as a **Team Member** within such one (1) year period; or
9. Any **Claim** against a **Team Member** solely by reason of their serving in such capacity, including service in an **Outside Capacity**.

Ex. 209, p. 33–34.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–36

insured versus insured exclusion apply, this exclusion encompasses all of the claims in the Underlying Lawsuits.

### a. Initial burden and Insuring Agreements implicated

As a preliminary matter, Divinia asserts it met its initial burden to establish its D&O claim is covered under the Policy. In support, Divinia highlights it emailed its D&O claim to Clear Blue's broker of record, Embroker; the D&O claim specifies it was made for the claims "asserted against the officers and directors of Divinia" in the Underlying Lawsuits;[27] and it "first became aware of the circumstances alleged against its officers and directors in the June 10, 2020 demand letter," *i.e.,* within the Policy Period, with the Underlying Lawsuits being filed two days later. Divinia divides the claims asserted in the Loan Lawsuit and Shareholder Lawsuit into two categories: contract-based claims, which it refers to as *ex contractu* claims, and tort and/or duty-based claims, which it refers to as "predominantly *ex delicto* claims." Divinia concedes that Counts I and II of the Loan Lawsuit, the breach of contract and breach of the covenant of good faith and fair dealing causes of action asserted against Divinia, are not within the scope of the Policy and it is not seeking coverage for them. Divinia characterizes Counts III (asserted against Divinia and the Sedlmayrs), IV (asserted against Divinia), and V (asserted against the

---

[27] Divinia's Notice of Claim is not entirely clear with respect to what it was seeking coverage for under the Policy. Divinia seemed to be seeking coverage for the Underlying Lawsuits in their entirety. Divinia's reference above that its D&O claim was made for the claims asserted against the officers and directors of Divinia is taken from Divinia's assertion that it first became aware of the claims asserted against these individuals on June 10, 2020. The Notice of Claim does not state it is seeking coverage for these claims only.

Sedlmayrs) of the Loan Lawsuit and the twelve claims asserted against the Sedlmayrs in the Shareholder Lawsuit as the "*ex delicto*" claims.[28]  Divinia asserts Breen and Mezzetta's "*ex delicto*" claims implicate (1) Insuring Agreement A ("Non-indemnifiable Directors & Officers Liability"), B ("Indemnifiable Directors & Officers"), C ("Entity Liability"), and D ("Derivative Costs") and (2) Divinia and the Sedlmayrs.  Doc. No. 74, p. 35.  Divinia does not articulate why exactly these insuring agreements apply.

In contrast, Clear Blue asserts Divinia's claim for coverage only implicates Insuring Agreements B ("Indemnifiable Directors & Officers") and C ("Entity Liability").  Doc. No. 75, p. 4.  Clue Blue does not argue why Insuring Agreements A and D are inapplicable but does offer argument on why Insuring Agreements B and C apply.  Clear Blue asserts these insuring agreements are implicated by Divinia's coverage claim for two reasons.  First, the Notice of Claim that Divinia submitted to Clear Blue was made on behalf of Divinia for the Underlying Lawsuits filed by Breen and Mezzetta against Divinia's directors and officers, specifically the Sedlmayrs.  Second, in its complaint in this proceeding, Divinia seeks coverage for defense costs and other expenses Divinia incurred in defending itself and to indemnify the Sedlmayrs.

Insuring Agreement A covers claims alleging wrongful acts brought against Divinia's directors and officers that Divinia has not indemnified.  Here, the record is barren as to whether Divinia will or can indemnify the claims asserted against the

---

[28]  This includes the breach of contract count in the Shareholder Lawsuit, which is based on the breach of Divinia's Bylaws.

Sedlmayrs.  Further, as noted above, neither party offered an argument concerning this insuring agreement's applicability other than a brief assertion by Ms. Audet, the management and executive risk claims specialist assigned to Divinia's D&O claim by Sedgwick, that there is a presumption of indemnification under the Policy.  Ms. Audet's assertion is in accord with Section XXII of the General Terms and Conditions, titled "Presumptive Indemnification," which states that Divinia "agree[s] to indemnify the **Team Members**, including the advancement of **Defense Costs** incurred by the **Team Member** to the fullest extent permitted by law or the certificate or articles of incorporation, … [or] by-laws…."  Ex. 209, p. 23.[29]

Since under the terms of the Policy, Divinia agreed to indemnify its Team Members to the maximum amount allowed by its Bylaws and Idaho law, the Court will turn to these two sources.

Section 7.4 of Divinia's Bylaws contains an indemnification provision, which states:

> The Corporation shall have the power to indemnify, to the maximum extent and in the manner permitted by the Idaho Business Corporation Act, each of its directors, officers, employees and agents against expenses, judgments, fines, settlements, and other amounts actually and reasonably

---

[29]  Another relevant section in the Policy addressing indemnification is Section V of the General Terms and Conditions.  Section V, titled "Retentions," states in relevant part:

> If the **Tech Startup** refuses or fails within sixty (60) days after a **Team Member**'s request to indemnify or advance covered **Loss** or if the **Insured** is unable to indemnify or advance covered **Loss** due to Financial Impairment, [Clear Blue] shall pay such covered **Loss** without applying the applicable **Retention**.

Ex. 209, p. 15.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–39

incurred in connection with any proceeding arising by reason of the fact
that such person is or was an agent of the Corporation.

Ex. 211, p. 28.

The Idaho Business Corporation Act (Idaho Code § 30-29-101 *et seq*.), which

Divinia's Bylaws invoke, provides the metes, bounds, and requirements for a

corporation's indemnification of its officers and directors.  *See* Idaho Code § 30-29-850

through 860.  The Act provides when a corporation must indemnify its directors (Idaho

Code § 30-29-852),[30] when such indemnification is permissive (Idaho Code § 30-29-

851(a)), and when it is not permitted (Idaho Code § 30-29-851(d)).  As to the latter

scenario, Idaho Code § 30-29-851(d) provides that:

> (d) Unless ordered by a court under section 30-29-854(a)(3), Idaho Code, a
> corporation may not indemnify a director:
>> (1)  In connection with a proceeding by or in the right of the
>> corporation, except for expenses incurred in connection with the
>> proceeding if it is determined that the director has met the relevant
>> standard of conduct under subsection (a) of this section; or
>> (2)  In connection with any proceeding with respect to conduct for
>> which the director was adjudged liable on the basis of receiving a
>> financial benefit to which he or she was not entitled, regardless of
>> whether it involved action in the director's official capacity.

Idaho Code § 30-29-851(d).

In accordance with this subsection of the Idaho Business Corporation Act, the

Court observes that some of the counts asserted against the Sedlmayrs in the Underlying

---

[30]  Idaho Code § 30-29-852, titled "Mandatory Indemnification," states:

> A corporation shall indemnify a director who was wholly successful, on the merits or
> otherwise, in the defense of any proceeding to which the director was a party because he
> or she was a director of the corporation against expenses incurred by the director in
> connection with the proceeding.

Lawsuits, including the derivative claims and those premised on the Sedlmayrs receiving

an improper financial benefit from Divinia, may not to be indemnifiable absent a court

order.  As to the other claims against the Sedlmayrs, the Court presumes Divinia has or

will indemnify the Sedlmayrs consistent with the terms of the Policy and its Bylaws.  As

to the derivative claims in the Shareholder Lawsuit, there is a carve-out for defense costs

if the directors meet the relevant conduct standard under Idaho Code § 30-29-851(a),

which states a corporation may indemnify a director, if:

> (1)(i)   The director conducted himself or herself in good faith; and
>    (ii)  The director reasonably believed:
>            (A)  In the case of conduct in an official capacity, that his or
>            her conduct was in the best interests of the corporation; and
>            (B)  In all other cases, that his or her conduct was at least not
>            opposed to the best interests of the corporation; and
>    (iii) In the case of any criminal proceeding, the director had no
>    reasonable cause to believe his or her conduct was unlawful; or
> (2)  The director engaged in conduct for which broader indemnification has
> been made permissible or obligatory under a provision of the articles of
> incorporation, as authorized by section 30-29-202(b)(5), Idaho Code.[31]

Idaho Code § 30-29-851(a).  However, again, there is nothing in the record that

addresses whether the Sedlmayrs sought indemnification for these claims, received

---

[31]  Idaho Code § 30-29-202(b)(5) provides that a corporation's articles of incorporation "may set forth":

> (5)  A provision permitting or making obligatory indemnification of a director for
> liability, as defined in section 30-29-850(3), Idaho Code, to any person for any action
> taken, or any failure to take any action, as a director, except liability for:
>            (i)  Receipt of a financial benefit to which the director is not entitled;
>            (ii)  An intentional infliction of harm on the corporation or its shareholders;
>            (iii) A violation of section 30-29-832, Idaho Code; or
>            (iv)  An intentional violation of criminal law;[.]

Divinia's articles of incorporation have no such language.  Ex. 312.

it, or whether the standard of conduct under Idaho Code § 30-29-851(a) has been

satisfied by the Sedlmayrs.[32]  Accordingly, the Court does not find Insuring

Agreement A is implicated.

Insuring Agreement D covers costs that Divinia incurs to investigate and evaluate

a derivative demand.  Again, no party identified anything in the record concerning costs

Divinia incurred to evaluate Breen and Mezzetta's derivative demand nor did the parties

make any argument with respect to the applicability of Insuring Agreement D.  As the

record stands, Breen and Mezzetta made a derivative demand on Divinia on June 10,

2020, pursuant to Idaho Code § 30-29-742, but filed their lawsuit two days later.[33]  There

---

[32]  In Divinia's complaint, it alleged:

> 16. Pursuant to the Insuring Agreements of the D&O Policy, Defendant is obligated to
> pay the defense and other costs Divinia incurs related to the Third-Party Suits [which is
> how Divinia referred to the Underlying Lawsuits].
>
> 17.  Pursuant to Article XXII of the General Terms and Conditions of the D&O Policy,
> Divinia has indemnified its Team Members for the defense and other costs they incur
> related to the Third-Party Suits.
>
> 18. Pursuant to Article V.C of the General Terms and Conditions of the Policy,
> Defendant is obligated to pay the defense and other costs Divinia's Team Members incur
> related to the Third-Party Suits, without reduction for any retention, if Divinia is unable
> to indemnify or advance the costs due to financial impairment.

Doc. No. 1, p. 4.  In its answer, Clear Blue denied Divinia's allegations regarding paragraph 16 and 18,
and asserted it lacked sufficient knowledge or information to form a belief as to the truth of the allegation
made in paragraph 17.  Doc. No. 18, p. 5.

[33]  Idaho Code § 30-29-742 precludes a shareholder from commencing a derivative action until:

> (a)  A written demand has been made upon the corporation to take suitable action; and
> (b)  Ninety (90) days have expired from the date delivery of the demand was made unless
> the shareholder has earlier been notified that the demand has been rejected by the
> corporation or unless irreparable injury to the corporation would result by waiting for the
> expiration of the ninety (90) day period.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–42

is no indication in the record that Divinia expended any sums to investigate the demand,[34] and accordingly there is no evidence that Divinia incurred any "Derivative Costs," that is investigative or other expenses to evaluate the merits of the allegation. Because the Shareholder Lawsuit was filed almost immediately after the derivative demand, the Court presumes there were not any.

In sum, the Court finds that Insuring Agreements B and C are implicated by Divinia's D&O claim. Insuring Agreement B covers Divinia's indemnification of claims alleging wrongful acts brought against Divinia's directors and officers. Insuring Agreement C covers loss Divinia incurs because of claims alleging wrongful acts brought against Divinia. As the Court understands it, these are the claims Divinia is seeking coverage for from Clear Blue. The Court will consider these insuring agreements in its analysis of the Policy's insured versus insured exclusion below.

### b. Relevant facts

The parties identified the following facts as relevant to the determination of whether the insured versus insured exclusion applies:[35]

- In 2017, Divinia entered into the Loan Agreement with Breen and Mezzetta, a condition of which was electing Breen and Mezzetta to its board of directors;
- Prior to the Loan Agreement's execution, Kiersten emailed Breen and Mezzetta a link to Divinia's bylaws, a draft shareholder notice, a draft board resolution, a draft shareholder approval, and a draft shareholder proxy form to effectuate Breen

---

[34] At trial, when questioned whether Divinia responded to the June 10 derivative demand and offer of compromise, Steven testified Divinia did not respond because the lawsuit was filed two days later, and they did not have time "to do any response."

[35] Doc. No. 74, p. 24; Doc. No. 75, p. 24–25.

or Mezzetta's appointment as additional directors, indicating she would send the relevant documents to the shareholders;

- Divinia's then-existing board of directors unanimously agreed that Breen and Mezzetta should be added as directors;

- The shareholder approval of Breen and Mezzetta's appointment as additional directors was only executed by Divinia's existing directors on December 1, 2017 (who comprised around 83% of Divinia's outstanding shares), without notice of a special meeting being sent to Divinia's other shareholders and without their attendance at the meeting;

- Breen and Mezzetta, along with eleven others, were Divinia's other shareholders as of December 1, 2017;

- These other shareholders never signed an approval for Breen and Mezzetta's appointment as additional directors of Divinia, nor were they asked to;

- Most of these shareholders were brought into Divinia by Breen and Mezzetta;

- Divinia believed it followed its Bylaws and Idaho law correctly by having the majority of its shareholders execute a written approval to add Breen and Mezzetta to the board;

- Divinia did not have all shareholders execute the written approval, which per Divinia and Clear Blue, Divinia's Bylaws and Idaho law require for the appointment of a board member without an in-person election;

- The Sedlmayrs, Breen, and Mezzetta all believed that Breen and Mezzetta had been correctly seated on the board;

- Believing Divinia had satisfied this condition of the Loan Agreement, Divinia borrowed $350,000 from Breen and Mezzetta;

- Believing Divinia appointed them to its board of directors, Breen and Mezzetta loaned $350,000 to Divinia;

- Breen and Mezzetta were included in board meetings (*e.g.,* Ex. 308);

- Divinia asked Breen and Mezzetta to sign resolutions and make disclosures required of board members (*e.g.* the "bad actor" check to the SEC. Exs. 110, 328, 329, 330);

- Divinia listed Breen and Mezzetta as directors on its SEC offering memorandum in 2018 and its 2018 and 2019 annual reports to the SEC (Exs. 312, 313, 314);[36]

- Divinia listed Breen and Mezzetta as directors on its StartEngine profile page; (Ex. 311);

- Divinia listed Breen and Mezzetta as directors on the annual reports it filed with the Idaho Secretary of State in 2018 and 2019.

---

[36] Exhibit 315 is identified as being Divinia's 2020 Annual Report to the SEC, but it appears to be a duplicate of Divinia's 2019 annual report, which is Exhibit 314.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–44

### c. Positions of the Parties

#### i) Clear Blue

Clear Blue argues the Policy's insured versus insured exclusion excludes coverage for the claims brought by Breen and Mezzetta because the Policy excludes all claims brought or maintained by any "Team Member."  Clear Blue concedes that Divinia did not have all its shareholders execute the shareholder approval of the board recommendation to add Breen and Mezzetta, which its "Bylaws and Idaho [law] technically require for appointment of a board member without an in-person election."  Doc. No. 74, p. 24.  But, Clear Blue asserts that "technical perfection" is not required to be a duly elected or appointed director under the Policy.  Doc. No. 75, p. 24.  Clear Blue acknowledges that the Policy does not define what it means to be "a duly elected or appointed" director, but asserts it is "not a mysterious phrase."  *Id.*  Per Clear Blue, by reference to Merriam-Webster.com definitions of "duly" and "due" it means "elected or appointed in a manner or time that is appropriate or adequate and in accord with accepted notions or procedures."[37,38]  Clear Blue asserts the underlying facts support that Divinia satisfied this

---

[37]  Merriam-Webster.com defines "duly" as "in a due manner or time : properly."  A secondary definition of "due," which Clear Blue relies on, defines "due" as "according to accepted notions or procedures: appropriate."  Black's Law Dictionary defines "duly" as "[i]n a proper manner; in accordance with legal requirements."  Black's Law Dictionary (11th ed. 2019).

[38]  Ms. Audet testified she determined under the Policy that "duly" means, with respect to the first part of the definition above, proper time rather than proper manner.  When asked by Divinia's counsel if she thought "duly" is ambiguous because it could be interpreted in two ways (that is at a proper time or in a proper manner), Ms. Audet testified she thought there was "a definition that fits the Policy," and whether her "definition is the correct interpretation is … up to the Court to decide."  Doc. No. 74, p. 26–27.

definition in its appointment of Breen and Mezzetta.  Specifically, Clear Blue asserts (i) Divinia was contractually obligated to add Breen and Mezzetta to its board; (ii) Divinia followed the procedure it thought was correct; (iii) Divinia consistently treated Breen and Mezzetta as directors, (iv) Divinia held Breen and Mezzetta out to the public as directors, including via filings with the Idaho Secretary of State and the SEC; and (v) Divinia took formal action to remove them as directors.

Clear Blue notes that Ms. Audet testified, in her capacity as a claims examiner, when she assesses whether a director has been "duly elected or appointed" under D&O policies, she does not "dig into" a company's corporate records to assess whether a director or officer's election or appointment was consistent with its bylaws and state law, rather she checks the public records.  Ms. Audet asserted because Divinia consistently held Breen and Mezzetta out as directors in its public filings they are Team Members under the Policy.[39]  Clear Blue concludes that it would be "nonsensical and tortured to interpret 'duly' in any other fashion." Doc. No. 75, p. 26.

In support, Clear Blue cites *Intelligent Digital Systems, LLC v. Beazley Ins. Co.*, 716 F. App'x 1, 2-3 (2d Cir. 2017) for the proposition that courts addressing the meaning of the phrase "duly elected or appointed" in insured versus insured exclusions have

---

[39]  Clear Blue asserts the same analysis applies to whether the Sedlmayrs are Team Members under the Policy, that is technical perfection in their appointment is not a prerequisite.  Clear Blue argues if so-called technical perfection in the appointment or election process is required to be a Team Member under the Policy, then there were also technical defects with the Sedlmayrs' status as directors and officers of Divinia.  Because of this, Clear Blue alternatively argues the Sedlmayrs are not Team Members under the Policy either.  Since the Court finds below that Divinia ratified the technical imperfection in the addition of Breen and Mezzetta to its board, the Court does not address Clear Blue's alternative argument on this point.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–46

concluded that "potential technical defects" do not make a director unduly appointed

when the company treats them as having been duly appointed. Alternatively, Clear Blue

argues that Divinia ratified Breen and Mezzetta's appointment to its board of directors,

which the Court will address in a subsequent section.

### ii) Divinia

Divinia argues Breen and Mezzetta are not Team Members as defined under the

Policy because neither were "*duly* (i.e., properly)" elected or appointed as a director.

Doc. No. 74, p. 25. This is because Divinia failed to secure unanimous shareholder

approval of Breen and Mezzetta's addition to the board or provide proper notice to

Divinia's other shareholders. Specifically, Divinia points to § 1.12 of its Bylaws and

Idaho Code § 30-29-704. Section 1.12 of Divinia's Bylaws state:

> Consent of Shareholders in Lieu of Meeting. Except as otherwise provided
> in the Articles of Incorporation or under the Idaho Business Corporation
> Act, any action that may be taken at any annual or special meeting of the
> shareholders may be taken without a meeting and without prior notice, *if a
> consent in writing, setting forth the action so taken, shall be signed by the
> holders of all outstanding shares entitled to vote thereon.*

Ex. 211, p. 21 (emphasis added). Idaho Code § 30-29-704, which is titled, "Action

Without Meeting," states:

> (a) Action required or permitted by this chapter to be taken at a
> shareholders' meeting may be taken without a meeting if the action is taken
> by all the shareholders entitled to vote on the action. *The action must be
> evidenced by one (1) or more written consents* bearing the date of signature
> and describing the action taken, *signed by all the shareholders entitled to
> vote on the action*, and delivered to the corporation for filing by the
> corporation with the minutes or corporate records.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–47

Idaho Code § 30-29-704 (emphasis added). Divinia reads these provisions as requiring

the unanimous written consent of all Divinia's shareholders for Breen and Mezzetta to be

"duly" elected within the meaning of the Policy if Divinia elects to seat its directors by a

consent in writing by its shareholders and without prior notice. Divinia further argues

that Clear Blue's offered definition of "duly" shows the term is ambiguous, and since

"duly" is ambiguous and being used to exclude coverage, it should be strictly construed

against Clear Blue under the relevant canons of construction for interpreting insurance

policies. Next, Divinia argues the *Intelligent Digital Systems* case cited by Clear Blue is

not instructive because the question at issue there was narrower, that is, not whether an

individual had been duly elected or appointed as a director, but rather whether a

corporation's bylaws required a separate, formal vote to increase its board of directors, to

which the court held the board could implicitly do what it was explicitly authorized to do.

Doc. No. 74, p. 29. Finally, Divinia argues that it did not ratify the defective addition of

Breen and Mezzetta to its board of directors.

### d. Were Breen and Mezzetta "duly elected or appointed" as directors such that they are Team Members under the Policy?

At issue is the language in the Policy's insured versus insured exclusion, which

excludes coverage for claims brought by or on behalf of Divinia or any Team Members.

Recall, a Team Member is an "Executive," which the Policy defines as "any natural

person who was, is or shall be a duly elected or appointed … [d]irector, officer, or member of the board .…" Ex. 209, p. 12.[40]

The Court disagrees with Clear Blue's interpretation that a "duly elected or appointed director" is a director that is appointed at a time (but not necessarily in a manner) that is appropriate or adequate and in accord with accepted notions or procedures.

Other courts interpreting "duly" in the context of insured versus insured exclusions in D&O policies have determined the term is unambiguous and held a director to be "duly appointed or elected," if the "procedures by which he was elected were conducted in a due manner, time, and degree." *Intelligent Dig. Sys., LLC v. Beazley Ins. Co.*, 906 F. Supp. 2d 80, 92 (E.D.N.Y. 2012) (citing *Julio & Sons Co. v. Travelers Cas. & Sur. Co. of Am.*, 684 F. Supp. 2d 330, 337 (S.D.N.Y. 2010); *Wojtunik v. Kealy*, No. CV-03-2161-PHX-PGR, 2011 U.S. Dist. LEXIS 36229, at *10 (D. Ariz. Mar. 31, 2011)). The Court concurs that the phrase "duly elected or appointed" is not ambiguous, and therefore will give the phrase its plain and ordinary meaning. The Court finds the Second Circuit's articulation of the plain meaning of a "duly elected or appointed director" in *Intelligent Digital Systems*, 716 F. App'x 1, 4 (2d Cir. 2017) apt and adopts it here. That is, a director is duly elected or appointed within the meaning of the Policy if he or she is

---

[40] The Policy also defines an Executive as a functional equivalent of any of the five foregoing examples of an Executive. Neither party addressed whether a director who was added to the board purportedly by improper means would be the functional equivalent of a "duly elected or appointed" director.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–49

"selected, by vote or appointment, in accordance with proper procedures."[41]  *Id.* at 4.  In

this case, the parties agree that Breen and Mezzetta were not elected or appointed in

---

[41]  As to the parties' invocation of this decision, and to the extent it is relevant, the Court finds Clear Blue reads the *Intelligent Digital Systems* decision too broadly, and Divinia too narrowly.  In *Intelligent Digital Systems* a founder of a technology company called IDS agreed to sell that company to another company, VMS.  *Intelligent Dig. Sys., LLC v. Beazley Ins. Co.*, 716 F. App'x 1, 2 (2d Cir. 2017).  As part of the sale, VMS agreed to add Russ, the founder of IDS, to VMS' board of directors.  *Id.*  VMS' board of directors approved Russ' appointment at a board meeting conditioned upon the sale closing.  *Id.*  The sale closed and VMS' general counsel confirmed to Russ he would be a director as of a May 2008 meeting.  *Id.*  Russ participated in three board meetings and was paid for his services.  *Id.*  In March 2009, IDS and Russ sued VMS and its other five directors for non-payment.  *Id.*

The insurance company that provided directors and officers insurance to VMA denied coverage under the policy, citing the insured versus insured exclusion.  *Id.*  This provision excluded coverage for "any Claim . . . by, on behalf of, or at the direction of any of the [directors and officers and the company]" with certain non-relevant exclusions.  *Id.* at 3.  The policy defined "'Directors and Officers' to include 'all persons who were, now are, or shall be duly elected or appointed directors.'"  *Id.* at 2.  A jury found Russ had been "duly elected or appointed within the meaning of the" policy, and thus the insured versus insured exclusion precluded coverage.  *Id.* at 3.

On appeal, the Second Circuit considered whether Russ was duly elected or appointed.  *Id.*  The plaintiffs argued the policy "language was ambiguous as to the process required for directors to be considered duly elected or appointed" and that VMS' bylaws "required the board to formally vote to expand its membership in addition to voting to appoint Russ as a new director."  *Intelligent Dig. Sys.*, 716 F. App'x at 4.

The Second Circuit found both arguments unavailing.  *Id.* at 4-5.  First, the Second Circuit found "the plain meaning of the phrase 'duly elected or appointed'" in the policy meant that "directors must be duly selected, by vote or appointment, in accordance with proper procedures."  *Id.* at 4.  The Second Circuit found nothing in the language of the policy that supported the plaintiffs' argument that the policy's omission of references to "'de facto' director[s]" made the language ambiguous.  As to plaintiffs' second argument, the Second Circuit stated:

> As an initial matter, we tend to disagree with the district court's conclusion that the bylaws were ambiguous: we doubt that the bylaws can be read to require a separate, formal vote to increase the number of directors from five to six.  While the bylaws provide that the number of directors was to be determined by the Board "from time to time," … the bylaws do not specify that a formal vote was needed to set or change the number.  By voting unanimously to appoint Russ as its sixth director, the board implicitly -- if not explicitly – "determined," … that it would increase its membership to six.  Contrary to plaintiffs' suggestion, the bylaws' reference to "newly-created directorships resulting from any increase in the authorized number of directors," does not explicitly require more formal action by the board.

> Even assuming that the district court correctly held that the bylaws were ambiguous, the question of whether Russ was duly elected or appointed as a director was put to the jury, and the jury determined that he was.  That decision was well supported by the largely

accordance with proper procedures (or as Clear Blue would say, there was not "technical perfection" in the appointment process) because Divinia proposed to add Breen and Mezzetta to its board through a board recommendation and shareholder vote. Divinia changed course at some point and ultimately did not hold a formal shareholder meeting or send notice of the meeting and proxy forms to all its shareholders. Apparently, Divinia failed to do this because it thought the holders of the majority of its shares could properly appoint Breen and Mezzetta. Based on Clear Blue's concession that Divinia did not properly follow its Bylaws to add Breen and Mezzetta to the board, the Court does not find that Breen and Mezzetta were duly elected or appointed within the meaning of the Policy as of December 1, 2017, that is, they were not seated in a manner consistent with Divinia's Bylaws. However, based on Divinia's conduct post-December 1, 2017 until shortly after Divinia's action to remove Breen and Mezzetta as board members, the Court finds Divinia ratified the technically defective appointment, making Breen and Mezzetta's addition to board "proper," as addressed in the next section.

### e. Ratification

---

undisputed evidence: all of VMS's five directors were present at the February 26, 2008 board meeting; Russ thereafter began serving as a director and sought confirmation that he was indeed covered by the Policy; he attended three board meetings and was paid for his service; and in various filings with government agencies, VMS represented that Russ was a director. All of the parties treated Russ as a duly elected or appointed director.

*Intelligent Dig. Sys.*, 716 F. App'x at 4-5 (internal citations omitted).

Clear Blue argues the facts show that Divinia ratified Breen and Mezzetta's

appointment to its board of directors under Idaho common law.[42]  As both parties

observed, under Idaho law, a defective corporate action may be ratified through statutory

corporate ratification procedures (Idaho Code § 30-29-146 *et seq*.), judicial validation

(Idaho Code § 30-29-152), and/or common law ratification (Idaho Code § 30-29-146(b)).

Both parties focus their arguments on common law ratification.[43]

Divinia identifies Idaho's common law ratification standard by reference to the

Idaho Civil Jury Instructions on the subject, which cite a pair of Idaho Supreme Court

decisions.  The instructions state:

---

[42]  Divinia also argues in its closing argument that Clear Blue ratified any potential coverage dispute by
allowing Divinia to extend the policy period for a second year, that is from December 11, 2020 to
December 11, 2021, after having received Divinia's Notice of Claim in November 2020.  The record is
unclear when Divinia extended the Policy, *see* Ex. 210, but Ms. Audet appeared to acknowledge it was in
December 2020.  When Divinia's counsel questioned Ms. Audet about this at trial he mistakenly asked
Ms. Audet if the extension of the policy was made in December 2021, which Ms. Audet confirmed.  The
Court notes this was before Clear Blue conveyed its preliminary coverage position to Divinia in January
2021 and before Clear Blue made any final determination with respect to its coverage obligations under
the Policy.  Accordingly, the Court does not find Clear Blue's extension of the Policy ratified any
potential coverage issues.

[43]  Idaho Code § 30-29-146 sets forth the universe of ways a corporate action can be ratified:

> (a) A defective corporate action shall not be void or voidable if ratified in accordance
> with section 30-29-147, Idaho Code, or validated in accordance with section 30-29-152,
> Idaho Code.
> (b) Ratification under section 30-29-147, Idaho Code, or validation under section 30-29-
> 152, Idaho Code, shall not be deemed to be the exclusive means of ratifying or validating
> any defective corporate action, and the absence or failure of ratification in accordance
> with sections 30-29-145 through 30-29-152, Idaho Code, *shall not, of itself, affect the
> validity or effectiveness of any corporate action properly ratified under common law or
> otherwise, nor shall it create a presumption that any such corporate action is or was a
> defective corporate action or void or voidable*[.]

(emphasis added).

Case 21-08042-JMM-Doc#-0005-AKF-Doc-04-04-23-2-Filed-04-04-23-Page-53-of-60 Desc Main
Document     Page 53 of 60

> If an agent acts outside the scope of authority, a principal may still become
> bound by the agent's actions if the principal ratifies the agent's actions.
> Ratification may be express or implied.  Implied ratification requires:
>
> > 1.  Knowledge on the part of the principal of the material facts
> > connected with the transaction; and
> >
> > 2.  Word or conduct on the part of the principal indicating an
> > intention to adopt the acts of the agent.

IDJI 6.43.2 (citing *Manning v. Twin Falls Clinic & Hosp.*, 122 Idaho 47, 54, 830 P.2d

1185, 1192 (1992); *Twin Falls Livestock v. Mid-century Ins.*, 117 Idaho 176, 182-183,

786 P.2d 567, 573-74 (1989)).[44]

Divinia concedes its board of directors may have "impliedly ratified the deficient

… appointment of Breen and Mezzetta as additional directors of Divinia,"

acknowledging that the Sedlmayrs and Sheldon Lu—Divinia's then-current directors—

executed a resolution agreeing that Breen and Mezzetta should be added to the board, and

the Sedlmayrs and Sheldon Lu—as the shareholders holding a majority-in-interest of

Divinia's shares—approved the board recommendation, and treated Breen and Mezzetta

as directors from December 2017 to the middle of 2020.  Doc. No. 74, p. 31.  But Divinia

asserts all Divinia's shareholders must have ratified Breen and Mezzetta's appointment as

additional directors, and nothing in the record shows the other shareholders of Divinia

(outside of the Sedlmayrs, Breen and Mezzetta, and Sheldon Lu) had knowledge of Breen

and Mezzetta's appointment and adopted their appointment by word or conduct.  Put

---

[44]  Clear Blue cites an Idaho Supreme Court case for essentially the same holding.  Doc. No. 75, p. 27
(citing *Gilmore v. Bonner Cty. Sch. Dist. No. 82*, 132 Idaho 257, 261, 971 P.2d 323, 327 (1999)
(Common law ratification occurs when a principal "adopts the benefits of the unauthorized transaction
with knowledge of all material facts."))

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–53

simply, Divinia asserts it must be the other shareholders who ratify the action of adding Breen and Mezzetta to Divinia's board.

In contrast, Clear Blue asserts Divinia did ratify its board and shareholders' "defective" addition of Breen and Mezzetta to the board because Divinia and its directors knew of the transaction and, "repeatedly adopted the benefits of the 'unauthorized' election of Breen and Mezzetta the board: by obtaining loan funds, by listing them as directors in their public filings, by holding them out as directors in their public offerings and crowdfunding efforts." Doc. No. 75, p. 27.

The Court notes the parties appear to disagree who the relevant principal is for the purposes of common law ratification. Divinia seems to assert that the relevant party is shareholders who did not receive notice of the special meeting to add Breen and Mezzetta as directors. In turn, Clear Blue appears to assert that Divinia, vis a vis its board of directors, is the principal.

The Court agrees with Clear Blue, and finds Divinia, as the principal, clearly ratified the decision of its agents, Divinia's board of directors/majority of its shareholders, to seat Breen and Mezzetta on its board as required under the Loan Agreement. Divinia was aware of the transaction and conducted itself as if Breen and Mezzetta were added to its board of directors. For example, Divinia listed Breen and Mezzetta on its SEC and Idaho Secretary of State reports, sought Breen and Mezzetta's approval as board members for, among other things, engaging in crowdfunding through StartEngine. Divinia also listed Breen and Mezzetta as directors on its StartEngine

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–54

profile.  Divinia even got D&O insurance for Breen and Mezzetta.  Further, in May 2020, Divinia took formal action to remove Breen and Mezzetta as directors for cause under the Idaho Business Corporation Act.  Ex. 318.  It was not until sometime after that—over two-and-a-half years later in 2020—that Divinia's board of directors came to think otherwise.  At that time, Breen and Mezzetta were bringing actions against Divinia, including a temporary restraining order citing their status and wrongful removal as directors.  Last, the Court also notes that none of Divinia's other shareholders, most of whom Breen and Mezzetta brought into the company, ever raised any issue with Breen and Mezzetta's addition to Divinia's board.  In sum, the Court finds Divinia ratified the actions of the Sedlmayrs and Sheldon Lu.

Supporting the Court's decision is the fact that Divinia's Bylaws and the Idaho Business Corporation Act empower Divinia to add additional board members by the unanimous consent of its board of directors.  Section 2.2 of Divinia's Bylaws state: "vacancies on the Board of Directors may be filled by appointment by the Board of Directors."  Ex. 211, p. 22.  Idaho Code § 30-29-810, which is titled "Vacancy on board of directors," provides in relevant part, "if a vacancy occurs on a board of directors, including a vacancy resulting from an increase in the number of directors … the board of directors may fill the vacancy[.]"  Idaho Code § 30-29-810(a)(2).  Here, the record shows that Divinia's board was in favor of Breen and Mezzetta's addition and Divinia's Bylaws are silent with respect to the number of individuals who may serve on its board.  While Divinia's corporate records show it sought to seat Breen and Mezzetta through the board

recommendation and shareholder approval process, Divinia's board had the implicit

authority to add Breen and Mezzetta though their unanimous consent, which Divinia

ratified through its later conduct.[45]

As an aside, the Court is skeptical that Divinia should be allowed to use its

apparent ignorance of its own Bylaws and the proper procedures to add directors to its

board (something it contractually obligated itself to do) as means to secure coverage for

claims that would otherwise be excludable.  This is to say, if Divinia properly seated

Breen and Mezzetta to its board as the Sedlmayrs and Breen and Mezzetta thought they

had, then coverage of Breen and Mezzetta's claims would be precluded under the insured

versus insured exclusion.  However, because Divinia did not notify or get the unanimous

consent of its shareholders—something it never sought to do in the first place—an

otherwise applicable exclusion is nullified.

---

[45]  Divinia argues this mechanism would not suffice to properly seat Breen and Mezzetta to Divinia's
board of directors for two reasons.  First, Divinia argues that while Section 2.2 of Divinia's Bylaws and
Idaho Code § 30-29-810(a)(2) provide that the board may fill a vacancy by appointment, it does not
require the board to do so, nor does it enable the board to fill a single vacancy with multiple directors.
Doc. No. 74, p. 27–28.  As to this point, Divinia misunderstands Idaho Code § 30-29-810(a)(2).  Per this
code section, vacancies can occur by a board increasing its number of directors.  If the board increases its
directors by two, there are two vacancies to be filled.   Divinia also asserts that Divinia's board only
named Breen and Mezzetta as additional directors subject to shareholder approval at a special meeting.
*Id.* at 28.  Again, the Court recognizes that Divinia apparently did not follow the appropriate procedures
for the manner in which it proposed to add Breen and Mezzetta to its board.  However, the board had the
ability to add Breen and Mezzetta on its own initiative as well.
    Divinia also argues no vacancy was created by Abdy resigning, because Idaho Code § 30-29-
807(a) requires a director to resign by delivering a written notice to the board, its chair, or secretary.  In
support Divinia cites *Kemmer v. Newman*, 161 Idaho 463, 467–68, 387 P.3d 131, 135–36 (2016)
(interpreting Idaho Code § 30-3-69(1), which has subsequently been repealed, but contains substantially
similar language as Idaho Code § 30-29-807(a)).  As to this point, whether a vacancy was created by
Abdy resigning or not is immaterial.  As explained above, a vacancy can result from a board increasing its
number of directors.  Further, Divinia ignores that its own corporate documents adding Breen and
Mezzetta to its board state that a director recently resigned, which to the extent it is true, could only refer
to Abdy since none of the other initial directors had resigned.

The Court concludes that Divinia's ratification made Divinia's addition of Breen and Mezzetta to its board of directors "proper." *See Manning v. Twin Falls Clinic & Hosp.*, 122 Idaho at 54, 830 P.2d at 1192 ("Although the effect of a ratified act is essentially the same as an act that was authorized, the distinguishing element is that ratification takes place after the act has occurred while authorization must occur before conduct arises."). Accordingly, because Breen and Mezzetta were Team Members, the insured versus insured the exclusion applies to the claims they asserted in the Underlying Lawsuits.

### f. Do any exceptions to the insured versus insured exclusion apply?

Finding the insured versus insured exclusion applies because Breen and Mezzetta are Team Members within the meaning of the Policy and because they are bringing derivative claims on behalf of Divinia against the Sedlmayrs, the next step in the Court's analysis is to determine whether any of the exceptions to this exclusion apply such that Clear Blue still has coverage obligations under the Policy.

As a preliminary matter, neither party addressed the relevance or applicability of the exceptions to the insured versus insured exclusion in any detail. Both parties framed the issue to be if Breen and Mezzetta are found to be "duly appointed directors," that is "Executives" and thus "Team Members" under the Policy, then Breen and Mezzetta's

claims in the Underlying Lawsuits are excluded under this exclusion.[46]  Nevertheless, the

Court finds potentially relevant exceptions are:

> 1.  **Defense Costs** covered under Insuring Agreement A;
> …
> 5.  Any **Claim** brought as a derivative action on behalf of the **Tech Startup**, by one or more persons who are not directors, officers, trustees, managers, or equivalent executives of the **Tech Startup**s [sic], and without the solicitation, assistance, active participation, or intervention of any **Insured** unless such solicitation, participation or intervention by the **Insured** is solely pursuant to or in compliance with a subpoena or similar legal process or is protected pursuant to any whistleblower statute, rule, or regulation; [or]
> …
> 8.  Any **Claim** by a **Team Member** who has not served as a **Team Member** within one (1) year prior to the date on which the **Claim** is first made and who maintains such **Claim** without the active assistance or active participation of the **Tech Startup** or **Outside Entity**, or any other **Team Member** who is serving or has served as a **Team Member** within such one (1) year period[.]

Ex. 209, p. 33–34.

Exception "1," excepts Defense Costs from the exclusion if Insuring Agreement A

is "in play."  Accordingly, for exception "1" to apply, Insuring Agreement A must be

implicated by the Underlying Lawsuits.  This means Divinia must not have indemnified

---

[46]  For example, in Divinia's pre-trial memorandum, Divinia conceded that because Breen and Mezzetta do not meet the definition of "Employee," the "only relevant term is 'Executive' [and] for the insured-versus-insured exclusion to bar Divinia's claim, Breen and Mezzetta must satisfy the definition of 'Executive.'"  Doc. No. 60, p. 7.  In Divinia's response to Clear Blue's objection to summary judgment, Divinia made a similar point as to what part of the insured versus insured exclusion is relevant.  Doc. No. 35, p. 13.  There Divinia stated "because neither Breen nor Mezzetta meet the definitions of Tech Startup or Outside Entity, the only relevant subpart is part 2: a 'Team Member in any capacity[.]'"  *Id.*  Divinia concluded that "for the Insured versus Insured exclusion to bar Divinia's insurance claim based on the Underlying Lawsuits, Breen and Mezzetta must strictly satisfy the definition of 'Team Member.'"  *Id.*  In Clear Blue's closing argument, it stated, "If Divinia met its burden to prove its claims are covered, a verdict still should be entered in Clear Blue's favor because Clear Blue met its burden to prove that the 'Insured v. Insured' exclusion applies."  Doc. No. 75, p. 24.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–58

the Sedlmayrs for their defense costs in the Underlying Lawsuits because Insuring

Agreement A concerns non-indemnifiable loss of Team Members.  Because the Court

found Insuring Agreement A was not shown to be implicated, the Court does not find this

exception applies.

As to exceptions "5" and "8," the Court finds the parties' apparent interpretation

that Breen and Mezzetta's status as Team Members precludes the applicability of the

insured versus insured exceptions to be the correct one.[47]   Exception "5" carves-out

shareholder derivative actions.  If the exception applies, Breen and Mezzetta's

shareholder derivative claims, that is counts 1-3, 5-8, and 11-13 in the Shareholder

Lawsuit would be covered. But the insured versus insured exclusion still applies if the

derivative action is prosecuted by directors or officers, or with the participation or

assistance of an Insured.  The Court finds that is what happened here.  Breen and

Mezzetta are shareholders of an Insured, Divinia, and sued on behalf of Divinia.  Breen

and Mezzetta are also both Insureds under the Policy as Team Members, since they are

"Executives" under the Policy, that is they both are a "natural person who was, is or shall

be a duly elected or appointed … director, officer, or member of the board."  Certainly,

Breen and Mezzetta participated in the derivative claims brought in the Shareholder

Lawsuit—they are ones who brought them.  The Court concludes under exception "5," if

a shareholder brings a derivative action on behalf of an Insured and they are also an

Insured, the shareholder derivative lawsuit carve-out is inapplicable.

---

[47] *See* n.46.

Last, the Court finds that exception "8" is inapplicable because Breen and
Mezzetta were Team Members within one-year of the date in which a Claim was first
made. As defined under the Policy, a Claim includes a "written demand against the
Insured for monetary damages." Ex. 209, p. 27. Such a Claim was first made on
December 10, 2019 when Breen and Mezzetta sent their demand for payment under the
Loan Agreement.[48]  Breen and Mezzetta were Team Members at this time, and were not
removed until May 2020.[49]

### Conclusion

For the foregoing reasons, the Court proposes that Clear Blue has no coverage
obligations under the Policy. Unless a different deadline is given by the District Court,
pursuant to 28 U.S.C. §157(d) and Rule 9033 of the Federal Rules of Bankruptcy
Procedure, the parties have FOURTEEN DAYS (14) following service of these Proposed
Findings of Fact and Conclusions of Law to file any objections thereto.

DATED: April 14, 2023



_____
JOSEPH M. MEIER
CHIEF U. S. BANKRUPTCY JUDGE

---

[48]  The parties do not dispute that a Claim was first made, as that term is defined under the Policy, by
Breen's December 10, 2019 demand letter to Divinia for repayment under the Loan Agreement. *See* Doc.
No. 74, p. 34; Doc. No. 75, p. 14.

[49]  In the Underlying Lawsuits, Breen and Mezzetta assert their removal on May 12, 2020 was wrongful.
If Breen and Mezzetta's removal as directors on this date impacted the applicability of exception "8,"
whether a wrongful removal could potentially negate a coverage exclusion would be an interesting
question, but not one that is necessary for the Court to resolve here.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW–60